DORCHESTER GAS PRODUCING
COMPANY, Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent.

No. 76–2504.

United States Court of Appeals,
Fifth Circuit.

April 18, 1978.

Sherman S. Poland, Ralph C. Oser, Washington, D. C., Clayton L. Orn, Houston, Tex., for petitioner.

John B. Will, Omaha, Neb., for intervenor Northern Natural Gas Co.

George C. Mastor, Minneapolis, Minn., for intervenor Northern Distributor Group.

James B. Proman, Minneapolis, Minn., for intervenor.

Allan Abbot Tuttle, Sol., Drexel D. Journey, Gen. Counsel, Thomas M. Walsh, Atty., Federal Power Commission, Washington, D. C., for respondent.

Before CLARK, RONEY and TJOFLAT, Circuit Judges.

TJOFLAT, Circuit Judge:

In this case, Dorchester Gas Producing Company (Dorchester) challenges the Federal Energy Regulatory Commission's (FERC's) rejection of a settlement agreement tendered by Dorchester for FERC's approval. The parties to the proposed agreement were Dorchester, a natural gas producer, and the Northern Natural Gas Company (Northern), an interstate pipe line company. By leave of this court, Northern appears before us as an intervenor in these proceedings, as does a group of nine utility companies who collectively account for a substantial volume of Northern's natural gas sales. The utility companies have intervened *en masse* as the "Northern Distributor Group." Northern and the utilities both side with Dorchester in urging that we reverse the FERC.

I

In order to understand Dorchester's position in this litigation—both before the FERC and before this court—it is necessary to appreciate the history of Dorchester's gas production, as well as the history of Dorchester itself. Dorchester has been in financial trouble almost since its inception, and in essence these financial woes directly underlie this lawsuit.

On July 1, 1954, Dorchester[1] acquired certain gas reserves in the Panhandle and Hugoton fields of Texas, Oklahoma, and Kansas.[2] At the time of their acquisition, these reserves were already developed and producing, and were dedicated to interstate sale. The purchase price was $37 million, and the transaction was financed through a method of purchase and sale referred to in the oil and gas industry as an "ABC transaction."[3] Under this scheme, Dorchester paid the sellers of the properties $2 million in cash, and the remaining $35 million was furnished through a loan from two life insurance companies. Pursuant to the agreement, 96% of the proceeds from the gas properties was earmarked for payment to the lenders (this share was commonly referred to as the "production payment"), and 3.5% of the proceeds was retained by Dor-

---

1. At the time of the acquisition, Dorchester Gas Producing Company did not exist. The acquiring party was Dorchester Corporation, and Dorchester Gas Producing Company was formed to hold the gas reserves in question here sometime after their acquisition. For the purposes of this case, there is no functional difference between Dorchester Corporation and Dorchester Gas Producing Company, and we shall use the name "Dorchester" throughout this statement of facts in order to avoid confusion.

2. For regulatory purposes, this region is known as the Hugoton-Anadarko area.

3. For simplicity's sake, we will herein devote only bare-bones treatment to Dorchester's method of financing its purchase of the gas reserves in question. The ABC transaction was a complicated but popular mechanism for acquiring oil and gas properties that was in its heyday when Dorchester acquired this gas.

ABC transactions were designed to secure to all interested parties—the seller, the buyer, and the financing institution—the maximum tax advantages available under the Internal Revenue Code. If properly executed, the ABC transaction would yield the following results to the parties: (1) the seller would be entitled to capital gains treatment of his proceeds on the sale; (2) the buyer would acquire the property with before-tax income, and whatever taxable income he realized would receive depletion allowance treatment; and (3) the financing party would enjoy depletion deductions on the money it received to pay off its loan. Felicitous arrangements such as this became prospectively unavailable after a 1969 revision of the tax laws—specifically the enactment of Internal Revenue Code § 636(a), 26 U.S.C. § 636(a) (1970)—and the ABC device is now passing into extinction. *See generally* 6 W. Summers, *The Law of Oil and Gas* §§ 1308–1308.7 (W. Flittie ed. 1967 & Supp.1977).

chester.[4] If things worked out according to plan, Dorchester's 3.5% share would cover its costs of operating the gas wells and its tax liabilities thereon. Eventually, of course, the loans would be paid and Dorchester would receive all the proceeds from the sales of its gas.[5]

Based upon its projected gas production and sales proceeds, Dorchester planned to have the full amount of its purchase loan paid off, with 5% per annum interest, in thirteen years, i. e., by mid-1967. By force of preexisting arrangements, Dorchester was contractually obligated to sell its gas to three pipeline companies, of which Northern was one. Dorchester's contract with Northern established a weighted-average sale price of 8.6¢/Mcf. Unfortunately, Dorchester's gas production and sales failed to generate the revenues Dorchester had projected when it acquired the gas reserves, and consequently Dorchester began to lag behind its anticipated timetable for paying off its creditors. As a result, Dorchester and Northern renegotiated their contract through arbitration in 1959, and the sale price of Dorchester's gas was increased to 17.5¢/Mcf. At this time, the FERC was on the way toward establishing an area-wide ceiling price for the Hugoton-Anadarko region, and Dorchester collected revenues under the renegotiated contract subject to a potential refund obligation when the applicable ceiling rate was established.

Despite the renegotiated price increase, Dorchester was still unable to pay its purchase money creditors to its own satisfaction. Accordingly, in 1964 Dorchester petitioned the FERC for relief from its sales contract with Northern, seeking a higher rate pursuant to the rule of *FPC v. Sierra Pacific Power Co.,* 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956).[6] The FERC denied the requested relief pending the outcome of the Hugoton-Anadarko area rate proceedings.

Finally, on September 18, 1970, the FERC issued Opinion 586, which established the area-wide ceiling rate for the Hugoton-Anadarko region. 44 F.P.C. 761 (1970). Under that order, it appeared that Dorchester had overcharged Northern by an aggregate $5.2 million over the years.[7] Thus, Opinion 586 immediately obligated Dorchester to refund $5.2 million to Northern. In its efforts to avoid this sizeable liability, Dorchester began negotiating with Northern to secure a mutual settlement of its obligation. Eventually, Dorchester and Northern came to terms and executed a settlement agreement on August 1, 1972. Under the terms of the agreement, which was captioned the "Exploration Fund Agreement," Dorchester would be allowed to divert the escrowed $5.2 million to exploratory use rather than to disburse the funds directly to Northern. In exchange for its present right to receive the funds,

4. The remaining 0.5% of the proceeds was dedicated to another party, and Dorchester eventually purchased that interest.

5. From the record, it appears that the 96.5%/3.5% ratio established in this transaction was a bit unusual. Apparently, it was customary for a producer-purchaser to retain a much larger percentage of the proceeds to cover its operating costs. In the proceedings below, a Dorchester witness stated that "I do not believe there is another production payment in existence which carried anywhere near this high a percentage designation of proceeds, figures of 75 to 80 [as opposed to 96%] would be much more common under production payments." Joint Appendix at 34.

6. The *Sierra* rule authorizes the FERC to raise prospectively a regulatee's contract price for gas in the event the extant contract price is so low as adversely to affect the public interest.

By implication, *Sierra* allows the FERC to increase a contract price for the sale of gas when the existing contract generates revenues which are so low that the producer's ability to render adequate service to its customers becomes impaired. *See FPC v. Sierra Pacific Power Co.,* 350 U.S. 348, 355, 76 S.Ct. 368, 100 L.Ed. 388 (1956).

7. In anticipation of its potential refund obligation, Dorchester had committed certain of its proceeds to an escrow account. The $5.2 million represented less than half of the total amount of money escrowed by Dorchester, which by 1970 exceeded $11 million.

Dorchester's refund obligation did not represent the full amount of the overcharge under its contract with Northern for sales executed since 1954 due to a retroactive refund rule established in Opinion 586. See note 1 *infra.*

Northern was guaranteed the right (*inter alia*) to purchase any gas discovered due to the expenditure of the exploratory fund at a price below the permissible rate ceiling. Eventually, the difference between Northern's actual purchase price and the allowable ceiling price for the gas would effectuate a 125% refund to Northern of the $5.2 million, assuming, of course, that the expenditure of the exploratory fund eventually yielded workable gas reserves in sufficient quantities.

In its efforts to secure FERC approval of the settlement agreement with Northern, Dorchester initiated this litigation on August 10, 1972, by petitioning the FERC for a release of the escrowed funds to exploration use as specified in the agreement. The FERC took no action on Dorchester's petition for over two and one-half years. Finally, on April 14, 1975, the Dorchester petition was denied. Dorchester filed a timely petition for rehearing, and, by an order entered on June 11, 1975, the petition for rehearing was granted. The FERC's June 11 order is of critical importance in this case in light of Dorchester's procedural objections to the FERC's actions below. That order provided in pertinent part as follows:

> We do not believe that Dorchester . . . is entitled in the light of Opinion No. 586 to retain excess amounts collected by it for purposes of exploration. But, we think Dorchester is entitled to present evidence showing that it is entitled to forgiveness of its refund obligation or a higher rate for its sales. See Permian I, 34 FPC at 227. And, in this light, we shall consider, of course, Dorchester's exploration proposal. But, we reiterate that we will not reconsider Dorchester's proposal absent a showing that it is entitled to refund forgiveness or a higher rate.

Joint Appendix at 212. The FERC's citation to "Permian I" was an allusion to the so-called *Permian* test, under which a producer will be allowed relief from his refund obligations accrued over a given period if he can demonstrate that those obligations "would deprive him of amounts sufficient to cover his out-of-pocket operating expenses . . . for such period." Opinion No. 468 (*Permian Basin Area Rate Proceeding*), 34 F.P.C. 159, 227 (1965), *aff'd sub nom. In re Permian Basin Area Rate Cases,* 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968).

Pursuant to the FERC's June 11 order, three days of hearings were held in September, 1975, during which Dorchester sought to adduce evidence to justify special relief under the *Permian* standard. In its efforts to demonstrate its inability to meet its out-of-pocket operating costs (*i. e.,* to meet the *Permian* test), Dorchester focused heavily on its perennial difficulties in meeting its obligations to its purchase-money creditors. At one point in the proceedings, Dorchester introduced a critical document, the probative effect of which is a central issue in this case. This document had been prepared in 1954, when Dorchester was evaluating the terms of its purchase of the gas reserves involved in this case. Captioned "Projected Leasehold Proceeds and Note Application," the document provided a yearly breakdown of Dorchester's 1954 projection of its total proceeds from the gas properties. The document reflects that Dorchester anticipated total proceeds from all its wells amounting to $51,891,000 over the thirteen-year period dating from the date of purchase. This figure was then placed into a formula [8] which indicated that Dorchester's share (3.5%) of the projected proceeds broke down into an anticipated allotment of $53.40 per well per month, which amount was designed to meet Dorchester's operating expenses in connection therewith.

---

**8.** To compute the monthly allotment per well, Dorchester took the product of the anticipated total proceeds from the gas properties ($51,891,000) and its share of those proceeds (.035), divided by the product of the number of months required to retire the notes that financed the acquisition (13 years × 12 months/year = 156 months) and the number of wells (218 wells). Thus, the actual computation was as follows:

$$\frac{\$51,891,000 \times .035}{156 \text{ months} \times 218 \text{ wells}} = \$53.40 \text{ per well per month}$$

When the hearings ended, Dorchester proffered its Exploration Fund Agreement with Northern as a settlement proposal. The administrative law judge certified Dorchester's proposal to the FERC, and the parties submitted their comments thereon. The FERC staff also commented, suggesting that Dorchester had failed to meet its burden of proof as to the standards enunciated in the FERC's June 11 order.

On March 15, 1976, the FERC issued an order rejecting Dorchester's settlement proposal and directing disbursement of the escrow funds for pass-through to Northern's customers. Essentially, the FERC agreed with its staff's position that Dorchester had not sustained its burden of proving that it was entitled to *Permian*-type relief. The Commission ruled that Dorchester's voluminous evidence of its inability to pay off its purchase-money creditors—including the evidence of greater-than-anticipated interest payments due to penalty obligations— was irrelevant to the issue whether Dorchester had received revenues sufficient to cover its out-of-pocket costs. Moreover, the FERC ruled that Dorchester had erroneously submitted evidence of its aggregate operating costs for all 218 wells Dorchester operated in the Hugoton-Anadarko region; in the opinion of the FERC, Dorchester's cost evidence should have been narrowed to cover only those wells which produced gas sold to Northern, since Dorchester's refund obligation to Northern was the only obligation from which Dorchester sought relief.[9]

Dorchester filed a timely petition for rehearing of the FERC's order rejecting its settlement proposal. In its petition, Dorchester claimed that the FERC's evaluation of Dorchester's ability to meet its out-of-pocket costs on its sales to Northern only— rather than its total sales in the Hugoton-Anadarko area—prejudicially altered the *Permian* criteria, which the FERC's June 11 order had established as the controlling standard. Dorchester emphasized language in the *Permian* opinion that indicated that,

for the purposes of the *Permian* proceedings, a producer's eligibility for refund forgiveness would be evaluated in terms of its ability to meet expenses on an area-wide, rather than single-sale, basis. Thus, Dorchester argued, the Commission's apparent focus on the sales to Northern, rather than on the area-wide sales as a whole, had effectively altered the nature of the FERC's inquiry after Dorchester's evidence had been submitted and without advance notice to Dorchester. Dorchester's position was that the FERC should at least vacate its order and remand the case for further proceedings before the administrative law judge in order to allow Dorchester the opportunity to submit additional evidence compatible with the FERC's single-sale approach. Dorchester did not specifically indicate, however, the nature of whatever new evidence it proposed to introduce.

Aside from this procedural matter, Dorchester's petition for rehearing further asserted that the FERC's rejection of the settlement agreement with Northern was predicated on inadequate findings of fact. The FERC's rejection order had specifically found that the settlement agreement was not "reasonable, proper, or in the public interest," but had contained no explanation for that conclusion. In Dorchester's view, some explanation was called for. Additionally, Dorchester cited two cases in which the FERC had approved settlements: *Kerr-McGee Corp.,* 52 F.P.C. 1077 (1974), and *Shell Oil Co.,* 4755 F.P.C. ——, 8 F.P.S. 5–916 (1976). Dorchester argued that the two cases were sufficiently similar to its own for it to claim that the Commission's rejection of the proposed settlement was "grossly discriminatory."

On May 13, 1976, the FERC denied Dorchester's petition for rehearing. First, it held that Dorchester's area-wide/single-sale distinction was irrelevant, since Dorchester's proffered evidence was insufficient under the *Permian* standard regardless of whether that standard was applied on an

---

9. As previously recounted, Dorchester's 218 wells produced gas which was sold to two other pipe line companies besides Northern.

area-wide or on a single-sale basis. In any event, the Commission stated, a single-sale inquiry was proper since Dorchester's obligation under its sales contract with Northern was the only issue before the Commission; Dorchester's inability to meet out-of-pocket costs for all its wells in the Hugoton-Anadarko area, the Commission felt, was irrelevant to whether Dorchester should be allowed refund forgiveness on the sales to Northern. Second, the Commission rejected Dorchester's argument that its disapproval of Dorchester's proposed settlement agreement with Northern was discriminatory. The FERC noted that in neither of the cases cited by Dorchester—*Kerr-McGee* or *Shell*—did the escrow fund in question accumulate through the producer's charging of excessive rates. Accordingly, the FERC stated, the legitimacy of the *Kerr-McGee* and *Shell* settlement agreements had not been governed by the *Permian* test, which had been the controlling standard in Dorchester's case. Finally, the Commission stated, Dorchester erred in suggesting that the FERC had failed to consider the public interest when it disapproved the settlement proposal. The Commission pointed out that its basic assessment of what was "in the public interest" had been made in Opinion 586, where the Commission had established a refund policy to compensate for producer overcharging. Furthermore, the Commission emphasized several aspects of the settlement agreement that appeared disadvantageous to Northern (and, ultimately, to Northern's customers), including the speculative nature of Dorchester's exploration plans coupled with the absence of guarantees to Northern that specific volumes of gas would be earmarked for sale to Northern in the event that the joint explorations yielded no further gas reserves. Thus, the FERC concluded, Dorchester had failed to demonstrate that the settlement proposal would yield greater public benefits than would the operation of the already established refund policy.

Dorchester here appeals the FERC's orders of March 15, 1976 (rejecting the exploration fund agreement), and May 13, 1976 (denying rehearing on the March 15 order).

Essentially, Dorchester asserts before us the same issues raised in its petition for rehearing before the Commission. Upon Dorchester's motion, the Commission has stayed Dorchester's obligation to refund the escrowed funds, pending judicial review of Dorchester's case.

II

Dorchester's claims of error in the proceedings before the Commission can be distilled into two chief complaints. First, Dorchester takes issue with the FERC's use of the *Permian* standard to evaluate the acceptability of Dorchester's settlement agreement. In this connection, Dorchester raises a procedural argument that the Commission failed properly to put it on notice of exactly how the *Permian* criteria were to be applied to Dorchester's case; furthermore, Dorchester raises a substantive objection to the Commission's decision to apply the *Permian* standard in the first place. Dorchester's second complaint centers on the Commission's determination that Dorchester's settlement agreement with Northern was not in the public interest. Dorchester contends not only that it demonstrated that its settlement agreement was consistent with the public interest, but also that the FERC's findings to the contrary were discriminatory in light of the Commission's disposition of the *Kerr-McGee* and *Shell* cases.

In considering Dorchester's procedural objection to the manner in which the Commission notified it that *Permian* would apply, we have thoroughly reviewed the Commission's order of June 11, 1975, which set forth that standard, and the record evidence submitted by Dorchester in response to that order. Dorchester contends that the FERC's decision to apply *Permian* on a single-sale basis—*i. e.*, to Dorchester's sales under the Northern contract only rather than on an area-wide basis—was tantamount to changing Dorchester's burden of proof after its evidence had been submitted. It is certainly true, as Dorchester submits, that under some circumstances a single-sale, rather than area-wide, analysis can

materially alter a producer's eligibility for refund forgiveness. If a producer's inability to meet out-of-pocket costs is assessed in terms of a single-sale transaction, and if the producer has been able to meet his costs in respect to that transaction but unable to meet his costs elsewhere in a given rate area, the producer may be denied the regulatory benefits—in terms of refund forgiveness or a higher rate allowance—that would normally follow from a showing of his inability to cover his costs in the rate area as a whole.[10] Whether Dorchester's case involved circumstances under which the application of a single-sale analysis would lead to less advantageous—and thus prejudicial—results for Dorchester, however, is something which we need not decide here. The primary problem with Dorchester's evidence before the Commission was a more basic one.

■ Fundamentally, the FERC's problems with the facts developed on the record by Dorchester did not originate in any distinctions between single-sale and area-wide evaluation. Rather, the basic problem stemmed from the manner in which Dorchester submitted its cost evidence, and this problem would have existed regardless of which test Dorchester's evidence was proffered to meet. The FERC's chief objection to Dorchester's evidence was twofold: first, Dorchester's 1954 document projecting its costs[11] purported to project only an *allowance* for costs, based upon Dorchester's anticipated revenues and its 3.5% share thereof; second, Dorchester's post-1954 documentary evidence failed to separate operating costs from capital costs: the post-1954 figures encompass both out-of-pocket costs and Dorchester's principal and interest payments (through the production-payment mechanism) on its promissory notes to its purchase-money creditors. Since Dorchester's cost computations included payments on its notes as an operating expense, there was no way for the FERC to determine whether Dorchester's revenues might have been sufficient to cover its operating expenses, or whether they were instead devoted to the capital costs of a highly leveraged

---

**10.** The *Permian* opinion itself indicates the sound reasoning behind adopting area-wide standards to govern eligibility for relief from the *Permian* base rates. The *Permian* test looks to area-wide costs in order to avoid compensating a producer for confiscatory rates on a well that is costly to operate while at the same time allowing that producer to reap windfall profits on cheaply operated wells in the same area. Thus, a producer may actually *benefit* from a single-sale analysis where it demonstrates that it cannot meet its out-of-pocket costs in connection with that single sale. If the producer is covering its costs on other wells in the rate area, the narrowed inquiry into a single sale will be more likely to result in special relief from the area rate than would the broader, area-wide inquiry.

In light of Dorchester's repeated pleas for special relief from its Northern contract, it is somewhat anomalous that it should now argue that it was prejudiced by the Commission's use of the single-sale approach. In asserting that it was prejudiced by the Commission's action, Dorchester tacitly implies that it was in fact covering its out-of-pocket costs in connection with the Northern sales, while failing to cover costs elsewhere in the Hugoton-Anadarko area. If that is Dorchester's position, it contravenes many of Dorchester's previous contentions in this case. Throughout the course of its dealings with the Commission—dating back, in fact, to its 1964 petition for *Sierra* relief—Dorchester has emphasized the financial difficulties caused by its sales contract with Northern. The Commission's view in this regard is that because of Dorchester's history of arguing that it needed specific relief from the Northern contract, it could not have been prejudiced by the Commission's narrowed inquiry into the Northern sales alone. Furthermore, the Commission contends that since the settlement agreement proposed by Dorchester pertained only to Dorchester's refund obligation to Northern, it was proper for the Commission to examine only the Northern sales in order to determine Dorchester's eligibility for refund forgiveness.

Although our examination of the record of this case invites sympathy for the Commission's position, we need not decide the propriety of narrowing the *Permian* test to single-sale analysis when a producer submits for Commission approval a settlement of its refund obligation arising out of less than all its sales in a given area. As we discuss *infra*, the Commission's objections to Dorchester's evidence ran deeper than the single-sale/area-wide distinction, and those objections would have obtained regardless of which of the two approaches to the problem the Commission took.

**11.** See text accompanying note 8 *supra*.

investment.[12]  In short, it appears to us that the Commission had a sound basis for concluding that Dorchester had failed to meet its burden of proving its entitlement to refund forgiveness through showing its inability to meet its out-of-pocket expenses.

■  Dorchester further contends, however, that even if the FERC correctly concluded that Dorchester had failed to meet its burden under the *Permian* test, the Commission's decision to use the *Permian* standard in its scrutiny of Dorchester's proposed settlement agreement was erroneous. Dorchester argues that since the *Permian I* case set forth standards to determine a producer's eligibility for outright refund forgiveness (or a higher rate for its gas sales), the *Permian* standard should not control where, as here, a producer merely attempts to settle its refund obligation by negotiating with the party to whom the refund is owed. Citing the FERC's "policy favoring settlement agreements"[13] and some general language from *Permian I*,[14] Dorchester contends that the FERC's approval of its settlement agreement with Northern should have hinged upon a broader range of criteria than simply its inability to meet operating costs. What Dorchester overlooks, however, is that the Commission's order of July 11, 1975, clearly specified that the operating costs issue would control its approval of the proffered settlement agreement. As that order had stated:

> We do not believe that Dorchester is entitled in light of Opinion No. 586 to retain excess amounts collected by it for purposes of exploration. But, we think Dorchester is entitled to present evidence showing that it is entitled to forgiveness of its refund obligation or a higher rate for its sales  .   .  .. And, in this light,

we shall consider, of course Dorchester's exploration proposal. *But, we reiterate that we will not reconsider Dorchester's proposal absent a showing that it is entitled to refund forgiveness or a higher rate.*

Joint Appendix at 212 (emphasis added). Thus, the FERC gave notice that it would fully apply the *Permian I* standard and that its approval of the proffered settlement agreement would depend on Dorchester's ability to meet that standard. By implication, the FERC's June 11 order established that the propriety of a refund proposal such as Dorchester's would depend upon the proponent's ability to demonstrate a need to retain overcharge funds to meet operating costs. This position was in full accordance with *Permian I*, which, despite its vague language regarding "special circumstances," mentions only the inability to meet out-of-pocket costs as a specific criterion for exceptional relief. And the record reflects that the cost evidence adduced by Dorchester was in fact designed to meet the standard set forth in the Commission's June 11 order.

In light of the deference which we must accord an administrative agency in its own area of expertise[15], we cannot say that the Commission erred when it elected to evaluate Dorchester's settlement proposal under *Permian I*'s recovery-of-costs criterion. This was wholly consistent with the FERC's basic policy judgment—as articulated in *Permian I*— that overcharge refunds customarily will best serve the public interest, and that refund forgiveness will normally be allowed only where a producer can show that it cannot meet its operating costs. Furthermore, the Commission would be ex-

---

12.  See notes 4 and 5 *supra* and accompanying text.

13.  *See* 18 C.F.R. § 1.18 (1977). A review of this regulation, however, reveals that it hardly evidences an endorsement of settlement procedures in general.

14.  In *Permian I*, the Commission had guaranteed that it would consider allowing producers individualized relief from the rate ceiling for Permian area gas if the area rates led to confis-

catory results. The FERC had further stated in *Permian I* that "[w]e need not and cannot here specify all of the special circumstances may serve as a basis for exceptions to the area rate." 34 F.P.C. 159, 226 (1965).

15.  *See, e. g., In re Permian Basin Area Rate Cases*, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968); *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944).

pected to apply refund forgiveness standards to settlement proposals such as Dorchester's. Despite providing for joint control of the exploration fund by Dorchester and Northern, and for Northern's first priority for any gas discovered, that proposal effectively called for Dorchester's diverting the escrowed funds to exploratory use just as if the funds represented a capital contribution to Dorchester. Under those circumstances, we cannot disapprove the Commission's decision to treat the proposal as though it called for outright refund forgiveness.

■ Dorchester's second chief complaint is that regardless of the question whether it satisfied the criteria for settlement approval established by the Commission's June 11 order, and regardless of what those criteria were, the FERC should have nevertheless approved the settlement agreement because (1) Dorchester had demonstrated that the settlement was in the public interest and (2) the Commission had approved settlements in similar cases and has not adequately explained its reluctance to do so in this case. Neither of Dorchester's contentions has persuaded us that the Commission acted improperly in this case. As to Dorchester's "public interest" argument, the Commission's order denying rehearing pointed out that the Commission's general determination of what is in the public's best interest has already been established by Opinion 586, 44 F.P.C. 761 (1970). That opinion determined the just and reasonable rate ceiling for the Hugoton-Anadarko area, and concomitantly expressed a Commission policy of ordering at least partial refunds of overcharges.[16] In light of the Commission's expertise in the field which it regulates, this is exactly the sort of policy judgment to which we ought to defer, so long as we can be assured that the FERC has exercised its judgment upon an adequate factual ba-

sis and that its conclusions are otherwise in accordance with law. The legal soundness of Opinion 586 has been established, *In re Hugoton-Anadarko Area Rate Case*, 466 F.2d 974 (9th Cir. 1972), and Dorchester cannot here challenge the general refund policy that the Commission follows in overcharge cases. On the record before us, moreover, we feel that there was substantial evidence before the Commission upon which to base the conclusion that Dorchester's settlement proposal did not justify a departure from the general refund policy. This is particularly so in view of the Commission's own criticisms of the Dorchester proposal, which primarily centered on the speculative and unguaranteed uses to which Dorchester wished to divert the funds. In short, there was an adequate basis on the record for the Commission to conclude that Dorchester's proposal did not best suit the public interest, and we must affirm the Commission's conclusion to that effect.

■ Finally, Dorchester argues that the Commission's rejection of its settlement agreement was discriminatory, and should be set aside pursuant to our authority under the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.* (1976).[17] Dorchester has cited several cases that arguably involve similar settlement proposals that eventually met with FERC approval. In each of these cases, however, the Commission has distinguished its results to our satisfaction. In neither the *Kerr-McGee* nor the *Shell Oil* case was the Commission faced with an overcharge situation. Thus, neither of those cases was subject to the *Permian* standards for refund forgiveness. Additionally, in both *Kerr-McGee* and *Shell Oil* the producers agreed to contribute moneys over and above the escrowed sum, which was something that Dorchester's agreement did not require. In our view, then, Dor-

16. Under the terms of that order, in fact, the Commission's policy was not to order full retroactive refunding. Rather, the FERC decided to order no refunds for overcollections prior to 1961, to order 70% refunds for overcharges in 1961 and 1962, and to order full refunds for only those overcharges received after 1962.

17. Specifically, Dorchester relies on 5 U.S.C. § 706 (1976), which provides in pertinent part that "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

chester has not shown that the FERC's disapproval of its proffered settlement was arbitrary or capricious, or in any other manner legally unsound.

■ We feel constrained, however, to note that the increasing problems wrought by the natural gas shortage may have substantially altered the Commission's assessment of the public interest during the two years that have elapsed since Dorchester first submitted evidence in support of its settlement proposal. Moreover, the Commission's disapproval of the terms of Dorchester's settlement agreement may be susceptible to recantation if Dorchester and Northern attempt to renegotiate the settlement terms. Accordingly, we feel that upon remand, the Commission should further stay its order for Dorchester to refund the escrowed funds in order to allow Dorchester the opportunity to submit an amended settlement agreement for FERC approval. Should Dorchester choose to do so, it should structure the terms of the new agreement to meet the specific objections voiced by the Commission in passing on Dorchester's original proposal. Should Dorchester choose not to submit a new proposal within a reasonable time, or should Dorchester submit a proposal that represents a materially unaltered version of the original agreement, the FERC is free to lift its stay in this case and to order forthwith Dorchester's compliance with the orders in issue here.

AFFIRMED AND REMANDED.

RONEY, Circuit Judge, concurring in part and dissenting in part:

I concur in the affirmance of the Commission's order, and all of the opinion except the last paragraph. I dissent from the remand of this case to the Commission and dissociate myself from the advice contained in the last paragraph of the opinion.

First, I doubt that we have authority to "Affirm and Remand." If the Commission's order withstands review, what happens after that is beyond judicial control. Upon the filing of petition for review, the Court shall "have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify or set aside such order in whole or in part." The Court can order additional evidence to be taken before the Commission, if needed. "The judgment and decree of the court, affirming, modifying, or setting aside" the order shall be final, subject to Supreme Court review. 15 U.S.C.A. § 717r.

Second, the advice as to what the Commission might do with a new settlement agreement seems out of keeping with our decision that the Commission was correct in finding that Dorchester failed to meet *Permian* standards to justify a refund under *any* settlement proposal. Having failed to show that it is entitled to a refund, Dorchester could not submit any proposal of new terms in a settlement agreement that would meet the Commission's objections. Suggesting that the Commission stay further its refund order for such exercise would seem to be a futility. *If* the Court thinks the case must be reopened to redetermine whether Dorchester can meet the *Permian* standards of refund forgiveness, then it should so order, but to leave that matter closed furnishes no reason for the Commission to consider a proposed settlement of the refund obligation.

For my part, I would adhere to the decision that the Commission has so far proceeded correctly, affirm its order, and stop there. I would leave the Commission to decide whether the case can, or should, in any way be reopened, without voicing any judicial suggestion about how it proceeds from here.