ESTATE of L. D. FRENCH, Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent.

No. 78–3785.

United States Court of Appeals,
Fifth Circuit.

Oct. 4, 1979.

Fulbright & Jaworski, Michael J. Manning, Patrick J. Keeley, Washington, D. C., for petitioner.

Robert R. Nordhaus, Gen. Counsel, F.E. R.C., Howard E. Shapiro, Sol., F.E.R.C., McNeill Watkins, II, Rhodell Fields, Washington, D. C., for respondent.

Before BROWN, Chief Judge, COLEMAN and TJOFLAT, Circuit Judges.

COLEMAN, Circuit Judge.

Petitioner, the Estate of L. D. French (Estate), seeks review of an order of the Federal Energy Regulatory Commission (Commission). The Commission denied the Estate's request for special relief from another Commission order which had required the Estate to refund certain sums received from interstate sales of natural gas. The Estate sold the gas at rates in excess of the just and reasonable area rates as determined by the Commission. Believing that the Commission properly acted within its discretion in the denial of the Estate's request for relief, we affirm that part of the order which denied relief as to the amount of the area-rate refund. However, because of the Commission's extensive delay in acting upon the Estate's request, we set aside that part of the order which imposed interest from November 1971 to the present.

## I. FACTS

L. D. French, d/b/a French Oil & Gas Company, was a small gas producer in the Texas Gulf Coast area. In 1952 French contracted with Texas Illinois Natural Gas Pipeline Company (Natural) for the sale of all of the gas produced by French from the O'Connell and Roesner Leases in Fulshear Field, Fort Bend County, Texas. The agreement was filed with the Federal Power Commission (now the Federal Energy Regulatory Commission) in 1954, being designated L. D. French Gas Rate Schedule No. 2.

Under the terms of the rate schedule, French was to collect from Natural rates of 15.0 cents per Mcf from December 1, 1953, through November 30, 1958; 16.0 cents per Mcf from December 1, 1958, through November 30, 1963; 17.0 cents per Mcf from December 1, 1963, through November 30, 1968; and 17.0 cents per Mcf thereafter. In addition to the stated rates French was also to receive reimbursement for state severance taxes. The Commission approved the initial rate of 15.1344 cents per Mcf, including tax reimbursement.

In keeping with the terms of the contract, in 1958 French sought a price increase from 15.1344 cents to 16.144 cents per Mcf. On November 28, 1958, the Commission issued an order suspending the rate increase and setting the matter for a hearing. French subsequently filed a motion under Section 4(e) of the Natural Gas Act, which allows producers to increase rates subject to a potential refund order. At the same time French filed a bond to assure refund of any excess charges. The rate was made effective as of May 1, 1959, by a Commission order issued June 4, 1959. French continued to sell gas from the O'Connell and Roesner leases at the 16.144 rate until the leases ceased production in August 1968, the same year in which French died. In addition to his interstate gas production, French had other oil- and gas-related business connected with the two leases. He also had significant investments in Texas loan services.

In 1960, the Commission, overwhelmed by the difficulties of determining just and reasonable rates for individual producers, announced that it would begin a series of proceedings to determine maximum producer's rates on an area-wide basis for each of the major producing areas. The Supreme Court subsequently upheld this approach in the *Permian Basin Area Rate Cases*, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968). On November 27, 1963, the Commission made French a respondent to the area proceeding for the Texas Gulf Coast area. Following extensive hearings by the examiner and further consideration by the Commission, but not until May 6, 1971, the Commission issued Opinion No. 595, 45 F.P.C. 674, establishing area rates applicable to French. This order was finally affirmed by the Court of Appeals for the District of Columbia in 1975. *Public Service Commission v. FPC*, D.C.Cir. 1975, 170 U.S.App.D.C. 153, 516 F.2d 746.

Opinion 595 found the just and reasonable rates for the Gulf Coast area for contracts executed prior to January 1, 1961, to be as follows: 15.0 cents per Mcf prior to January 1, 1965; 17.0 cents from January 1, 1965, to September 30, 1968; 19.0 cents from October 1, 1968, to September 30,

1973; 20.0 cents on and after October 1, 1973. The Order stated that any amounts collected in excess of the stated rates would be subject to refund, plus interest, and required producers with past sales exceeding the rates to file refund reports. The refund obligation could be met either by (1) retaining the money subject to further order of the Commission directing disposition of the amounts or by (2) dedicating additional gas reserves for sale to interstate pipelines, for which the producer would receive a refund credit of one cent per Mcf dedicated. Producers who retained the funds subject to a final order of disposition could either commingle the funds, with liability for interest on them, or put them in escrow. Finally, producers were allowed to petition for special relief from the refund order.

The 16.0 contract rate French received accordingly exceeded the area rate from May 1, 1959 through December 31, 1964. The Commission's opinion required French to refund with interest the amounts above the established area rate for the gas sold to Natural. With quality and tax adjustments, French's rate exceeded the area rate by 0.790286 cents per Mcf. For total sales of 2,499,135 Mcf from May 1, 1959, to December 31, 1964, French had received an excess of $19,750.31. The addition of interest at 6 percent made French's total refund obligation in 1971 $34,647.85.

Upon the issuance of Opinion No. 595, in November, 1971, French's estate filed a refund report and a "Petition for Special Relief From Area Rates". The Estate cited its non-liquid position, asserting that 73 percent of its assets were represented by small oil producing operations and by the loan company which was French's principal business. In addition, the Estate sought to show that French's gas operations under the O'Connell and Roesner leases were marginal and that the small profits would be substantially reduced if the refund were required. Consequently, the petition asked that the Estate be relieved of the refund obligation. Alternatively, it asked that it not be required to accumulate interest on the funds pending final disposition by the Commission. Citing its inability to dedicate additional reserves, as it had none, and the impracticality of putting the money in escrow because of its non-liquid position—the two other alternatives available to producers—the Estate invoked equitable consideration to suspend the running of interest.

The Commission sought updated financial information from the Estate in 1972, but it took no substantive action on the petition while the area rate proceeding itself was pending the courts. In 1977 the Commission requested additional information. Finally, on September 12, 1978, the Commission denied the Estate's request for special relief and assessed the Estate's additional interest from 1971 to 1978. The Commission thus ordered the Estate to refund the excess charge with interest, or a total of $48,853.47. The Estate's application for rehearing was denied by operation of law.

The Estate brings this action to review the Commission's denial of the petition for special relief. The Estate does not challenge the area rate proceeding, nor does it deny that it owes a refund under the area rates. The sole question is the propriety of the Commission's action of September 12, 1978.

## II.  ISSUES

The Estate raises four challenges to the denial of its request for special relief. First, the Commission's September 12 letter failed to meet the minimal standards for such agency decisions. Second, the Commission's denial of the application for special relief was an arbitrary abuse of discretion. Third, the Commission unreasonably and inexcusably delayed processing the application for special relief. Finally, equity requires that the running of interest be suspended from 1971 to the present.

### A.  *Adequacy of the Commission's Order*

We begin with the Estate's contention that the September 12, 1978, letter denying the petition for special relief failed to articulate an adequate basis for the Commission's decision. The letter stated, "Based upon a review of your request and the supplemental data submitted upon Staff re-

quest, it appears that the Estate has the financial ability to make the required refunds. Accordingly, your request for relief is denied." The letter contained no separate statement of findings or facts.

The Commission issued its order as the result of informal agency action. In acting on the request for relief, it was not required by the statute to conduct formal proceedings. In general, an agency does not have to propound formal findings and reasons when it issues a decision in an informal proceeding. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); K. Davis, Administrative Law of the Seventies § 16 at 378 (1976). As the Supreme Court stated in *Overton Park,* the absence of formal findings in such cases does not necessarily require a rejection of the administrator's decision. However, there must be sufficient indication in the agency decision of the basis for the Commission's action, so that the court may ascertain whether the agency action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, as outlined by 5 U.S.C. § 706 (1976).

Since the Estate filed a written petition for relief, Section 555(e) of the Administrative Procedure Act applies and requires that the agency notice of denial be accompanied by a brief statement of the grounds for denial. Here the Commission has done more than merely deny the petition. It has indicated its general reasons for doing so. We hold that this complies with the APA's requirement for a brief statement of reasons. This expression of the Commission's construction of the evidence adequately enables us to review the decision. Furthermore, unlike the Court in *Overton Park,* we have before us the full record which formed the basis for the Commission's action.

### B. *Abuse of Discretion*

The Estate contends that the Commission's denial of the petition for special relief was an arbitrary abuse of discretion. We must reject this argument.

Section 4 of the Natural Gas Act, 15 U.S.C. § 717c(e) (1976), empowers the Commission to order refunds of amounts charged by natural gas producers in excess of the appropriately determined just and reasonable rates. Although this power is discretionary, not mandatory, *Placid Oil Co. v. FPC,* 5 Cir. 1973, 483 F.2d 880, 905, *affirmed sub nom. Mobil Oil Corp. v. FPC,* 417 U.S. 283, 94 S.Ct. 2328, 41 L.Ed.2d 72 (1974), the Commission in its area rate proceedings has adopted provisions requiring refunds by producers. Opinion No. 595, 45 F.P.C. 674 (1971) (*affirmed sub nom. Public Service Commission v. FPC,* D.C.Cir. 1975, 170 U.S.App.D.C. 153, 516 F.2d 746), the area rate proceeding applicable to French, adhered to this procedure and required producers either to make refunds or to dedicate additional reserves to the interstate market and receive a refund credit of one cent per Mcf. Opinion No. 595, 45 F.P.C. at 710. At the same time, the Commission has allowed exemptions from the rate and refund requirements. *Id.* at 716; Opinion No. 468, 34 F.P.C. 159, 225–27, 232–33 (1965), *affirmed sub nom. Permian Basin Area Rate Cases,* 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968). Thus in the Permian Basin Area Rate Proceeding, which outlined the nature of the refund procedure, the Commission noted that "a producer should not be required to make refunds for past periods which would deprive him of amounts sufficient to cover his out-of-pocket operating expenses . . . for such period." Opinion No. 468, 34 F.P.C. at 227.

The courts have recognized that the Commission has the power to forgive refund obligations or alter the nature of the obligation where the facts and equities warrant such relief. *Permian Basin Area Rate Cases,* 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968); *In Re Other Southwest Area Case* (OSWA I), 5 Cir. 1973, 484 F.2d 469, *cert. denied sub nom. Mobil Oil Corp. v. FPC,* 417 U.S. 973, 94 S.Ct. 3180, 41 L.Ed.2d 1144 (1974); *Placid Oil Co. v. FPC,* 483 F.2d at 903–06; *In re Hugoton-Anadarko Area Rate Case,* 9 Cir. 1972, 466 F.2d 974, 990–91.

Likewise, this Court has stated that the Commission is to explore and give due weight to considerations of equity when imposing refund obligations. *Gillring Oil Co. v. FERC,* 5 Cir. 1978, 566 F.2d 1323, 1325–26, *cert. denied,* 439 U.S. 823, 99 S.Ct. 91, 58 L.Ed.2d 115 (1978); *Continental Oil Co. v. FPC,* 5 Cir. 1967, 378 F.2d 510, 532, *cert. denied sub nom. Austral Oil Co. v. FPC,* 391 U.S. 917, 88 S.Ct. 1801, 20 L.Ed.2d 655 (1968). Nevertheless, the courts have repeatedly noted that the Commission enjoys wide latitude in acting upon individual requests for special relief. *FERC v. Pennzoil Producing Co.,* 439 U.S. 508, 519, 99 S.Ct. 765, 772, 58 L.Ed.2d 773 (1979); *Louisiana Land & Exploration Co. v. FERC,* 5 Cir. 1978, 574 F.2d 204, 208–09, *cert. denied,* 439 U.S. 1127, 99 S.Ct. 1043, 59 L.Ed.2d 88 (1979); *Gillring Oil Co. v. FERC,* 566 F.2d at 1326; *Placid Oil Co. v. FPC,* 483 F.2d at 905.

To be sure, the Commission has utilized a number of equitable factors in determining whether refunds should be excused. These factors include the passage of time, the amounts owed, whether the sales are still jurisdictional, whether the refunds would pass to consumers who actually paid the money, the relative size of the producer, and whether on balance there is a benefit to the public interest. See Rosario Production Co., Opinion No. 781, 10 FPS 5–1032 (Nov. 8, 1976); *Gillring Oil Co. v. FERC,* 566 F.2d at 1326–27. But in applying these equitable considerations the Commission must not lose sight of its responsibility to "afford consumers a complete, permanent and effective bond of protection from excessive rates and charges." *Atlantic Refining Co. v. Public Service Commission,* 360 U.S. 378, 388, 79 S.Ct. 1246, 1253, 3 L.Ed.2d 1312 (1959); see also *Texas Eastern Transmission Corp. v. FPC,* 5 Cir. 1969, 414 F.2d 344, 347 ("statutory authority to require refunds must be coupled with the fact of the overriding purpose of the Natural Gas Act to protect consumers in their purchase of gas to the end of keeping rates as low as possible").

Given the Commission's broad discretion in balancing these competing considerations, our review of the Commission's action is necessarily restricted. As we observed in another challenge to an agency refund decision, the scope of our review is limited to ascertaining whether there is a rational basis for the agency's determination. *Texas Eastern Transmission Corp. v. FPC,* 414 F.2d at 349–50. Employing a similarly limited focus here, we find that the agency's action did have a rational basis and consequently hold that the agency did not abuse its discretion in denying the Estate's petition for special relief.

In its initial petition the Estate based its request for special relief upon the "severe hardship" that would be imposed on the Estate if it were required to make the refund payments. In support of this contention the Estate makes two arguments. First, French's gas operations were marginal and the requirement of refund payments would make the "meager profits" become "almost nonexistent". Record at 4. Second, the Estate is in a seriously non-liquid position, as evidenced by the Estate's obtaining a $75,000 loan in order to pay its debts, and requiring liquidation to pay the refund could result in sales of assets at prices below their assessed value.

The Commission, in denying the request, found that the Estate had the financial ability to make the refunds. There is substantial support in the record for the decision. We examine first French's gas operations and then consider the condition of the Estate, recognizing that the petitioner bears the burden of demonstrating to the Commission facts sufficient to entitle it to the relief sought. Opinion No. 468, 34 F.P.C. at 227; *Dorchester Gas Producing Co. v. FERC,* 5 Cir. 1978, 571 F.2d 823, 831.

## 1. Gas Operations

The Estate advances two positions in its original petition and briefs concerning the French gas operation. It asserts that for the period in question French's refund obligation exceeded its net profit. Alternatively, it contends that the imposition of refund

obligations would prevent French from receiving a fair rate of return on his investment.

The Estate's original petition stated that French's regulated gas operations from the O'Connell and Roesner leases produced a profit of $76,159 during the period in which his price exceeded that set by the Commission. The petition also noted that these operations had sustained a net loss during two years of the period and argued that French did not realize a fair rate of return on investment. Later financial statements submitted to the Commission revise the figures for French's operation, with the Estate arguing in its reply brief that French realized a net profit of $22,623 between May 1, 1959, and December 31, 1964, and a net profit of only $5,683 from these leases for the period from May 1, 1959 through cessation of production in 1968. The Estate thus contends that the refund payments exceed the net profit.

■ Deciding the precise figures for French's regulated operation seems impossible on the record. Indeed, the accountants who prepared one set of financial statements submitted to the Commission noted a number of discrepancies in the various reports and specifically refused to certify the statements according to generally accepted auditing procedures and standards. Consequently, we explore this area with considerable trepidation. The appendix to the Estate's petition, which listed a profit of $76,159 on French's gas operations, specifically excluded depletion allowances from the calculations but included depreciation. A second set of financial statements submitted to the Commission included depletion and depreciation figures and forms the basis for the Estate's assertion that the operations showed a net profit of $22,623 for the period in question. Yet these figures do not distinguish between jurisdictional and non-jurisdictional operating expenses. In evaluating the propriety of special relief when the sole issue is the reasonableness of the rate ceiling in light of the individual producer's particular operation, the Commission must limit its consideration

to the income and expenses of jurisdictional sales. As the Supreme Court noted in *FPC v. United Gas Pipe Line Co.*, 386 U.S. 237, 243, 87 S.Ct. 1003, 1007, 18 L.Ed.2d 18 (1967), ratemaking is subject to the rule that "the income and expense of unregulated and regulated activities should be segregated." The Commission cannot look to the balance sheet of total oil and gas operations if those operations include substantial non-jurisdictional sales or expenses. Similar constraints apply to its consideration of petitions for special relief. By like token, to meet its burden, the Petitioner must present to the Commission figures which adequately *separate* jurisdictional and non-jurisdictional accounts. In this the Petitioner has failed.

Another difficulty plagues both the figures submitted by the Petitioner and the reasoning employed by both the Commission and the Petitioner in their briefs. In both sets of financial data submitted by the Estate, there exists a gross income figure and a suspense figure, that amount of income subject to repayment. The appendix to the original petition explicitly states that gross income does not include suspense charges. Although the second set of data does not say that suspense income is excluded from gross income, a comparison of the two sets of figures indicates this is probably the case. That would be in keeping with usual accounting practice which creates a reserve income account to offset a potential liability account. The result of the exclusion of suspense income from gross income figures is a net profit figure which is over and above the amount due as the basic refund liability. In other words, the profit figures cited by Petitioner are actually the profit remaining after the refund liability is subtracted. Thus, although the Commission did not argue this in its brief, we find on the record before us that the profit figure, whether it is the $76,000 initially stated or the $22,000 or $5,000 asserted later, is an amount by which the total profit exceeded the refund amounts. Therefore, contrary to the Estate's assertion, the net profit was not less than the refunds payable.

We pursued this extended accounting exercise because the Estate contends that expenses exceeded income when the Commission's rate ceiling is adhered to. The Commission has stated that a producer is entitled to relief when out-of-pocket operating expenses exceed the income generated at the established rate. Opinion No. 468, 34 F.P.C. at 227; *Dorchester Gas Producing Co. v. FERC*, 571 F.2d at 827. Thus the Commission has indicated how it will exercise its discretion on those facts. A demonstration in the record that French's out-of-pocket operating expenses exceeded his income from sales at the Commission's rate over the refund period would have entitled the Estate to relief. In light of the Commission's own statement, the failure to grant that relief would be an abuse of discretion. On the record before us, however, we cannot say that those expenses exceeded revenues. Indeed, as discussed above, we find that revenues at the established rate exceeded expenses. Furthermore, the Estate's figures include depreciation and depletion as expenses, and as we recently observed in *Dorchester Producing Co. v. FERC*, 571 F.2d at 830, capital costs may not be treated as out-of-pocket operating expenses.

In *Dorchester Producing Co.* we upheld the Commission's denial of refund relief where the financial statements submitted by a producer failed to separate operating costs from capital costs. There, we noted that because the producer's cost computations included as an operating expense payments on notes which financed the acquisition of producer's gas reserves, it was impossible for the Commission to determine whether the producer's revenues might have been sufficient to cover its operating expenses. We agreed with the Commission that the producer has failed to meet its burden of proving its entitlement to refund forgiveness. We make a similar decision here. Even if our accounting should prove to have been faulty, the Estate, with its confused and inconsistent financial reports, simply has not met its burden.

During the time the petition was pending before the Commission, the Estate's argument was that French's operation was marginal and his profits small and declining. Yet, the courts have repeatedly stated that under area rate determinations producers are not entitled to any set rate of return. *Permian Basin Area Rate Cases*, 390 U.S. at 771, 88 S.Ct. 1344 (producer's inability to recover either its unsuccessful exploration costs or the full 12% return on its production investment would not, without more, warrant relief); *In Re Hugoton-Anadarko Area Rate Cases*, 466 F.2d at 982–83. The rate of return is only one factor among many the Commission may consider in balancing producers' needs with its broader effort to protect consumers and serve the public interest. The Supreme Court earlier this year addressed this issue in clear terms:

[T]he notion that the Commission is required to maintain, or even allowed to maintain to the exclusion of other considerations, the profit margin of any particular producer is incompatible not only with the specific area approach to natural gas regulation approved in *Permian Basin* and *Mobil Oil*, but also with a basic precept of rate regulation. . . . The Commission is not required by the Act to grant special relief from area or nationwide rates simply because the costs of an individual producer increase and his profits decline.

*FERC v. Pennzoil Producing Co.*, 439 U.S. 508, 518, 99 S.Ct. 765, 772, 58 L.Ed.2d 773 (1979).

While the Commission could have granted an exemption because of French's low rate of return, it was not required to do so, and, given the deference we must accord the Commission in its own area of expertise, *Dorchester Gas Producing Co. v. FERC*, 571 F.2d at 831, we cannot find its refusal to do so an abuse of discretion.

### 2. *Condition of the Estate*

The second component of the Estate's hardship argument asserts that the non-liquid condition of the Estate makes repayment of the refund difficult. Here the Commission is not limited to an examina-

tion of the oil and gas components of the Estate (which have already been terminated). The primary argument made by Petitioner in its request for special relief was the general hardship that could befall the Estate if it were forced to comply with the refund order. Consequently, the predominate issue before the Commission was not the propriety of the rate structure in the context of French's oil operations. That was a subsidiary point, and one which, as we have noted, the Commission properly resolved. Rather, the central issue was the overall impact of the repayment on the Estate. In examining the impact of such hardship the Commission was well within its bounds to explore the total financial condition of the Estate and examine its available assets, whatever their source. The Estate itself put the whole Estate's condition in issue. It cannot now be heard to complain when the Commission acts upon the basis of the total assets available to the Estate.

Petitioner's objection to the Commission's use of Estate financial data is further undercut by the fact that the proceeds from French's jurisdictional gas operations have been completely commingled with, and absorbed by, the other assets of the Estate. Since it is impossible on the record to trace those proceeds, the Commission may properly assume that they are dispersed throughout the Estate's assets. French and the Estate knew that the jurisdictional sales were subject to refund. French, doing business as an unincorporated enterprise, commingled the funds at his own risk. The Estate cannot now be heard to complain when the Commission holds the full Estate accountable for the refund.

The Commission further did not abuse its discretion in its final decision to deny the relief sought on the basis of hardship.

At the end of 1975, the Estate had assets of $191,372, with $38,811 in refund reserve as an outstanding liability. (The computation of these asset figures includes a one-half interest totalling $184,401 in the French holdings in various loan services.) Thus the Estate had $230,183 available to make the refund payment. Apparently $34,428 of this was in cash, deposit accounts, savings accounts, and certificates of deposit which were also pledged as security for notes payable. During 1975 the Estate had cash withdrawals of $27,754. In 1974 cash withdrawals equaled $32,370. Based on this information the Commission could have concluded that the Estate had the "financial ability to make the required refunds." Its decision is not an arbitrary abuse of discretion. The estate had substantial liquid assets, while its outstanding long-term indebtedness was apparently only $26,890. (It is unclear from the record exactly what percentage of current assets and notes payable belongs to Mrs. French and what portion belongs to the Estate.) This combined with the Estate's total asset figure was more than adequate to meet the refund obligation. The Commission is not obligated to preserve the integrity of the Estate. The fact that the Estate remained in a significantly non-liquid position is not sufficient grounds for finding that the Commission acted beyond its discretion, particularly in light of the large cash withdrawals in 1974 and 1975.

The Estate asserts that the Commission was required to examine the condition of the Estate at the time of the petition in 1971 since the Estate's liquidity position had subsequently improved. We disagree. Where the issue is financial hardship the Commission is entitled to take account of any changes in condition that occur prior to the issuance of a final decision. The primary consideration is the degree of hardship that exists at the time the Commission completes its study of the petition for special relief.

Finally, we recognize that from time to time the Commission has granted relief based on other equitable factors, particularly where the refund amount was relatively small. See, e. g., Rosario Production Co., Opinion No. 781, 10 FPS 5–1032 (Nov. 8, 1976); J. A. Kimmey, Docket No. G–16858 (April 11, 1979). The fact that the Commission grants relief on one set of facts does not require it to do so on another. In

*Rosario*, for example, the producer was an intrastate seller whose sales became subject to Commission regulations by virtue of the *Lo-Vaca Gathering* doctrine, *California v. Lo-Vaca Gathering Co.*, 379 U.S. 366, 85 S.Ct. 486, 13 L.Ed.2d 357 (1956), while in *Kimmey*, the widow of the producer sought relief because of her inability to satisfy the outstanding debts of her late husband. The facts of these cases thus differ significantly from those presently under consideration.

### C. The Commission's Delay

■ We consider together the Estate's contentions that the Commission unreasonably delayed its decision and that equitable considerations require the suspension of interest from 1971 to 1978. We agree with the Estate. The Commission's delay in the proceedings involving French's gas rates has by no means been inconsiderable. First, the Commission took *eight years* to decide what the just and reasonable rate for the Texas Gulf Coast area was. Then the Commission took *another seven years* to act on the petition for the special relief. Nineteen years after French assumed a potential refund liability, the Commission entered its final order denying special relief. While we recognize that the complexities and burden of work upon the Commission are considerable, there is little to be said in favor of such delays when committed by an agency whose paramount function is to decide issues such as we have here. Nevertheless, our authority to set aside agency action because of delay is not unrestricted by reason of prior court decisions.

Under the Administrative Procedure Act, administrative agencies have a duty to decide issues within a reasonable time, 5 U.S.C. § 555(b) (1976). Reviewing courts have a duty to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Here, however, the agency action has been rendered and great care must be observed in setting aside the agency decision. In *J. H. Rutter-Rex Manufacturing Company v. NLRB*, 5 Cir. 1968, 399 F.2d 356, we found the NLRB's five-year delay in processing back pay awards to be

so inordinate as to require modification of the award. The Supreme Court agreed that the delay was "deplorable", but it nevertheless reversed for exceeding the narrow scope of review provided for Board remedial orders when our decision shifted the cost of the delay from the company to the employees. *NLRB v. J. H. Rutter-Rex Manufacturing Co.*, 396 U.S. 258, 90 S.Ct. 417, 24 L.Ed.2d 405 (1969).

In other challenges to agency delay, we have stated that there must be a showing of prejudice before agency action can be set aside for lack of punctuality. *EEOC v. Exchange Security Bank*, 5 Cir. 1976, 529 F.2d 1214; *Chromcraft Corp. v. EEOC*, 5 Cir. 1972, 465 F.2d 745. In addition, in *Chromcraft* we noted that the delay was the result of an "undisputed workload and an overburdened staff" and pointed out that there had been no suggestion that it resulted from "slothfulness, lethargy, inertia or caprice." 465 F.2d at 747–48.

With these considerations in mind we look at the effect of Commission delay on the obligation of the Estate to refund the excess to 1971. The Estate has not shown itself to have been prejudiced by the delay. The delay did not increase the underlying refund liability. The Estate has not suffered any additional loss because of the delay. The prospect of having to liquidate portions of the Estate's holdings to pay the refund amounts, with interest, up until the determination of that issue which finally occurred in 1971 was well known and fully understood. It was voluntarily undertaken when the increase was deliberately effected, under bond. That is all there is to this aspect of the case. The refund of the excess rates, with interest to 1971, is clearly mandated and that part of the Commission order will not be overturned.

The imposition of interest from 1971 to the time of the final decision on the application for special relief is a different matter. There the Commission delay has indeed prejudiced the Estate, subjecting it to an additional liability of $14,200 in the form of accrued interest.

The Commission points out that under Opinion No. 595, which engendered the refund obligation, producers had the choice of commingling refunds with general assets, incurring liability for the accumulation of interest, or depositing the funds in an escrow account. Even so the application for special relief asserted the non-liquid condition of the Estate, rendering the escrow alternative a difficult one. Whatever else might be said, the Estate certainly had a right to expect a decision within a reasonable time. It would violate even the most fundamental notions of equity to allow the Commission to assess interest caused by its own delay, such as that encountered here, and we decline to countenance it. This is so because we conclude that the seven years delay between the submission of the petition in November 1971, and the decision in September 1978, is *per se* unreasonable. It does not comply with the Commission's own assertion that "[a]ny such petition will be disposed of as promptly as possible." Opinion No. 468, 34 F.P.C. at 227. The Commission admits that it did not actively consider the Estate's petition so long as judicial review of the underlying area rate orders was pending. Even if we were to find this action acceptable, it does not justify the Commission's delay for another three years while the Commission had the interest meter running.

The Commission points out that it did not order the disbursement of refunds until 1976. This really is not relevant. The petition was not based on the refund disbursement order. It was grounded on the initial *refund obligation.* While Opinion No. 595 was on appeal the Commission neither drafted a tentative order nor seriously examined the petition. Its inability, if there was an inability, to act promptly on the petition once the Opinion was upheld was its own fault—Let the citizen await the leisurely pleasure of his servant, the government. Our view is reinforced by the unchallenged assertion in the Estate's brief that "[a]t one point during this delay, a Commission staff member, in requesting another copy of the application for Special Relief, stated that part of the Petitioner's file had been lost." Petitioner's Brief at 16.

We set aside that portion of the Commission's order which imposed the accumulation of interest from and after November 17, 1971.

As hereinabove set out, the Commission order is affirmed in part and modified in part. The case is remanded to the Commission for further proceedings not inconsistent herewith.

AFFIRMED IN PART, MODIFIED IN PART AND REMANDED.