William **PERLMAN**, Petitioner,

v.

**FEDERAL ENERGY REGULATORY COMMISSION**, Respondent.

No. 87–4791.

United States Court of Appeals, Fifth Circuit.

May 19, 1988.
Rehearing Denied June 17, 1988.

---

**530**

John, Hengerer & Esposito, Douglas F. John, Washington, D.C., Julie Simon, for petitioner.

Joanne Leveque, Jerome M. Feit, Sol., F.E.R.C., Washington, D.C., Frank R. Lindh, for respondent.

Before GARZA, JOHNSON, and HIGGINBOTHAM, Circuit Judges.

JOHNSON, Circuit Judge:

Petitioner William Perlman appeals an order by the Federal Energy Regulatory Commission (FERC) denying him adjustment relief under § 502(c), 15 U.S.C. § 3412(c), of the Natural Gas Policy Act of 1978 (NGPA). Because we do not believe the FERC abused its discretion in denying Perlman relief, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

Section 107(b), 15 U.S.C. § 3317(b) of the Natural Gas Policy Act (NGPA) authorizes the FERC to prescribe incentive prices for "high-cost natural gas." One of the goals of the NGPA and the incentive pricing scheme was to encourage the development of sources considered unprofitable at the existing price ceiling. *Williston Basin Interstate Pipeline Co. v. FERC*, 816 F.2d 777, 779 (D.C.Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 748, 98 L.Ed.2d 761 (1988). Consistent with this goal, President Carter, on July 16, 1979, delivered a "national energy speech," wherein the President referred generally to the need for incentives to develop natural gas. In 1980, the FERC, pursuant to its authority under the NGPA, adopted regulations establishing an incentive price program for the development of new tight formation gas and recompletion tight formation gas.[1]

Of particular importance to the instant case is the definition established by the FERC for "recompletion tight formation gas" qualifying for incentive price. "Recompletion tight formation gas" is gas produced from a designated tight formation, if the surface drilling of the well was begun before July 16, 1979, but the well was not completed for production in the tight formation prior to July 16, 1979. Order No. 99, 45 Fed.Reg. 56,034 (1980), 18 C.F.R. 271.703(b)(3) (1981). In 1983, the FERC expanded the definition of "recompletion tight formation gas" qualifying for incentive gas pricing to include recompletions completed on or after July 16, 1979 in wells

---

1. "A 'tight formation' is a sedimentary layer of rock cemented together in a manner that greatly hinders the flow of any gas through the rock." Order No. 99, 45 Fed.Reg. 56,034 (1980).

drilled in qualified tight formations prior to July 16, 1979, provided that the gas is produced from a new completion location completed after December 23, 1983. Order No. 345, 48 Fed.Reg. 49,505 (1983), 18 C.F.R. 271.703(b)(3)(ii) (1984).

In the instant case, William Perlman drilled a well, the Ada Cauthorn well, in the "Lower Canyon" of the Canyon Sandstone Formation located in Sutton County, Texas. Perlman commenced the drilling of the Cauthorn well in December 1972 and completed the well in 1973. Thereafter, in May and June of 1975, approximately 542 Mcf of gas was produced from the Cauthorn well. Subsequent to the 1975 production, the Cauthorn well was deemed uneconomic by Perlman and shut in. In April 1979, Perlman began workover operations to determine if the Cauthorn well could be brought back into profitable production, but on May 13, 1979, those efforts were abandoned.

In September 1979, following President Carter's "national energy speech," Perlman reentered the Cauthorn well, this time in the "Upper Canyon" of the Canyon Sandstone Formation. After filing an application with the Texas Railroad Commission in which Perlman requested confirmation from the Commission that the Cauthorn well qualified as a recompletion tight formation well, Perlman began selling production from the Cauthorn well to El Paso Natural Gas Company (El Paso) at the NGPA § 107 tight sands incentive price; however, the Canyon Sandstone Formation was not designated as a "tight formation" qualifying for incentive pricing until the FERC issued Order No. 117 which became effective on December 22, 1980. Order No. 117, 45 Fed.Reg. 84,036 (1980), 18 C.F.R. § 271.703(d)(10) (1981). Perlman continued to sell tight formation gas from the Cauthorn well to El Paso at the incentive price from October 1979 until July 1983. In the interim, on June 7, 1982, the Texas Railroad Commission issued a final determination that the production for the Cauthorn well qualified as "recompletion tight formation gas" for purposes of the NGPA's incentive pricing scheme. The Railroad Commission's determination became final on August 15, 1982.

Prompted by concern that the Cauthorn well might not qualify for incentive pricing due to the prior 1975 production, Perlman petitioned the FERC to reopen and vacate its final well category determination in August 1983. Specifically, Perlman requested that the FERC withdraw his application for a NGPA § 107 determination because production from the Cauthorn well prior to July 16, 1979 prevented gas from any other completion in the designated tight formation, the Canyon Sandstone Formation, from qualifying under 18 C.F.R. § 271.703(b)(3) for the NGPA incentive price. On June 20, 1985, the well determination was reopened and vacated by the FERC. *William Perlman*, 31 FERC (CCH) ¶ 61,341 (1985). In vacating the well determination, the FERC also ordered Perlman to "refund, with interest, all amounts collected in excess of the otherwise applicable maximum lawful price."

Thereafter, Perlman filed a petition for "reconsideration" of the FERC's order, in which Perlman maintained that, after reevaluation of his situation, he no longer believed the Cauthorn well to be disqualified from NGPA incentive pricing. In his petition, Perlman argued that the regulatory definition of "recompletion tight formation gas," which is limited to wells "not completed for production from [a] designated formation prior to July 16, 1979," should be construed to exclude from the incentive price program only those wells that produced in commercial, not *de minimus*, quantities prior to the July 16, 1979 date. The FERC subsequently rejected Perlman's arguments and denied his request for reconsideration. *Perlman*, 35 FERC (CCH) ¶ 61,085 (1986).

On September 4, 1986, Perlman filed a petition for "adjustment" under NGPA § 502(c), 15 U.S.C. § 3412(c), seeking an adjustment from the strict application of the definition of "recompletion tight formation gas" so as to be excused from refund liability for the sales of gas from the Cauthorn well to El Paso at the incentive price between October 1979 and July 1983. El

Paso intervened in the proceeding, but did not oppose the relief sought by Perlman. Pursuant to a delegation of authority, the Director of the FERC's Office of Pipeline and Producer Regulation denied Perlman's petition for adjustment. *Perlman*, 38 FERC (CCH) ¶ 62,122 (1987). Thereafter, Perlman petitioned for review of the Director's decision with the FERC. On July 2, 1987, the FERC issued an order affirming the Director's decision and later denied Perlman's request for rehearing of that order. Perlman appeals the FERC's orders. The sole issue presented by Perlman's appeal to this Court is whether the FERC abused its discretion in denying Perlman's request for adjustment from the strict application of the NGPA definition of "recompletion tight formation gas." Concluding that the FERC did not abuse its discretion, we affirm.

## II. DISCUSSION

### A. *Standard of Review*

■ Pursuant to § 502(c) of the NGPA, the FERC is authorized to grant adjustments from the applicable regulations of the NGPA "as may be necessary to prevent special hardship, inequity, or an unfair distribution of burdens." Section 502(c) is a vehicle by which the FERC is able to apply NGPA regulations in a manner which is tailored to the particular facts of a case when the equities appear to require variations from the strict application of NGPA rules. Because the grant of adjustment by the FERC is a discretionary one, appellate review of FERC action in this area is necessarily limited in scope. In previous cases involving the waiver of strict application of NGPA rules, this Court has applied an abuse of discretion standard for reviewing the FERC's denial of such special relief. *See Mitchell Energy Corp. v. FERC*, 662 F.2d 1111 (5th Cir.1981); *Columbia Gas Development Corp. v. FERC*, 651 F.2d 1146, 1160 n. 18 (5th Cir.1981); *Estate of French v. FERC*, 603 F.2d 1158, 1162–63 (5th Cir.1979). Specifically, the Court has stated,

> The grant of such relief is within FERC's equitable discretion. Denials of such re-

lief are reviewable by the appellate courts under the abuse of discretion standard. In reviewing such denials, the scope of review is limited to ascertaining whether there is a rational basis for and substantial evidence supporting the agency's determination. The agency must of course set out clearly the ground that forms the basis for the denial of discretionary relief so that appellate courts can undertake this review.

*Columbia Gas*, 651 F.2d at 1160 n. 18 (citations omitted). Consistent with our policy of according deference to the FERC in situations involving equitable relief, this Court recently reviewed an order by the FERC denying relief under § 502(c), concluding that the FERC's decision was both rational and comported with FERC precedent; therefore, the FERC's decision was sustained. *Kaneb Energy Co. v. FERC*, 814 F.2d 1083, 1085 (5th Cir.1987).

Further, in reviewing the FERC's decision to grant adjustment relief in the instant case, we are mindful of the fact that the FERC "enjoys wide latitude in acting upon individual requests for special relief." *Estate of French*, 603 F.2d at 1163. In making its determination, the FERC is to explore and give due weight to considerations of equity when imposing refund obligations. Additionally, while the equities of a certain case may appear to support a deviation from the strict application of the NGPA, the FERC is guided at all times by the principle that "Congress recognized that incentives need to be carefully tailored to reach only gas that needs an incentive and should not be available to gas that needs no incentive." *Columbia Gas*, 651 F.2d at 1160. Thus, in reviewing the FERC's decision on a § 502(c) request, this Court, recognizing the FERC's duty to balance congressional policy with the equities of each situation, will not overturn the FERC's decision absent an abuse of discretion. In this regard, appellate review is limited to ascertaining whether the FERC's decision is rational, supported by substantial evidence, and comports with prior FERC precedent.

## B. *Perlman's Reliance*

Perlman bears the burden of proof to demonstrate sufficient facts to entitle him to adjustment relief. *See Estate of French*, 603 F.2d at 1163. In the instant case, Perlman maintains that the FERC abused its discretion by denying him adjustment relief without considering his direct reliance on the prospect of incentive prices in response to President Carter's energy speech and the impression created by the industry when he reentered the Cauthorn well in September 1979. Specifically, Perlman points to an article appearing in the *Houston Chronicle* on July 16, 1979, which states "Carter ordered the Federal Energy Regulatory Commission to set a special incentive price for natural gas from tight sands." Perlman asserts that his reliance on these signals from the federal government entitles him to an equitable adjustment under the NGPA. While initially a question arose as to the credibility of Perlman's assertion that he relied on signals from the federal government in reentering the Cauthorn well in 1979, at oral argument, the FERC conceded the credibility of Perlman's statement that he relied on those signals. Nevertheless, the FERC maintains that Perlman's reliance in this regard was not reasonable and therefore, that his reliance did not entitle him to adjustment relief.

Reviewing the speech of President Carter, we find no specific mention of incentive pricing for "tight formation gas." In the portion of his speech pertinent to the instant case, President Carter stated:

> To give us energy security, I am asking for the most massive peace-time commitment of funds and resources in our Nation's history to develop America's own alternative sources of fuel—from coal, from oil shale, from plant products for gasohol, from *unconventional gas*, from the Sun.

President's Address to the Nation, *Energy and National Goals*, 1979 *Pub. Papers* 1235 (July 15, 1979) (emphasis added). As previously noted, the *Houston Chronicle* did mention incentive pricing for "tight sands;" however, beyond these vague references, Perlman cannot cite any specific signals from the federal government that an incentive price program would be initiated for tight sand formation gas at the time he reentered the Cauthorn well and importantly, Perlman cannot point to any authority that the Cauthorn well would qualify for incentive pricing if such pricing were to be implemented. At the time Perlman reentered the Cauthorn well in September 1979, there were no regulations in effect permitting Perlman to collect the incentive price from El Paso; in fact, specific regulations setting forth the qualifying criteria for "recompletion tight formation gas" were not proposed for inclusion in the incentive pricing program until February 1980 when the FERC issued a notice of proposed rule making. 45 Fed.Reg. 13,-427 (1980). That proposed rule making did not become final until August 15, 1980 when the FERC issued Order No. 99. Order No. 99 established guidelines for formally designating tight formations and for determining if wells drilled into such formations would qualify for incentive pricing.[2]

■ Thus, Perlman's reliance in reentering the Cauthorn well was based solely on a speech by President Carter and a newspaper article which contained no specific definitions, no incentive prices, and no indications of what formations or gas would qualify for incentive pricing. While we do not address the credibility of Perlman's claim that he relied on the speech in his reentry of the Cauthorn well, we cannot say that the FERC abused its discretion in denying Perlman adjustment relief on the basis that "it was unreasonable for Perl-

---

2. Prior to the February 20, 1980, notice of proposed rule making, the FERC issued an August 29, 1979, proposed rule making. 44 Fed.Reg. 52,253 (1979). The latter proposed rule making occurred prior to Perlman's reentry into the Cauthorn well. Perlman maintains that he did not have notice of the August 29, 1979, rule making. Without addressing whether Perlman had actual knowledge of the August 29 rule making, we agree with the FERC that "Perlman's lack of notice of a pending tight sand rule cannot justify his reentry into [the] Cauthorn well."

man to rely on President Carter's general statement of policy as a basis for reentry into the Cauthorn well."

C. *Order No. 345*

▉ Perlman further contends that the FERC's refusal to grant him adjustment relief by applying FERC Order No. 345 in a retroactive manner constitutes an abuse of discretion. Order No. 345 was issued to cure certain inequities created by the manner in which state agencies were designating tight formations. Specifically, some state agencies were designating production zones as one tight formation where the zone might have been designated as two separate tight formations, while other state agencies were not designating production zones in a similar manner. The resulting inequity was that a recompletion that qualified in one state might not qualify in another merely because of the manner in which the state agency defined the tight formation. Therefore, the FERC issued Order No. 345 which expanded the definition of "recompletion tight formation gas" by including recompletions completed on or after July 16, 1979, in wells drilled in qualified tight formations prior to July 16, 1979, provided that the gas is produced from a new completion location completed after December 23, 1983.

Of importance to Perlman's well is the fact that the effective date of Order No. 345 was December 23, 1983. Thus, Perlman's recompleted Cauthorn well did not qualify for the Order No. 345 definition of "recompletion tight formation gas" as the new completion location for the Cauthorn well was completed prior to December 23, 1983. If, however, the FERC were to apply Order No. 345 retroactively, as Perlman urges, the production from the Cauthorn well would qualify for incentive pricing. Perlman alleges that had the Texas Railroad Commission designated the single Canyon Sandstone Formation into two tight formations—the Upper and Lower Canyon—the recompletion of the Cauthorn well in 1979 in the "Upper Canyon" would have qualified for incentive pricing despite the previous production from the "Lower Canyon." Thus, Perlman asserts that his situation is precisely the type of inequity which the FERC sought to remedy by promulgating Order No. 345.

What undermines Perlman's argument, however, is that the FERC determined as a matter of policy that Order No. 345 would be applied prospectively from December 23, 1983, not retroactively. In concluding that Order No. 345 was to apply prospectively from December 23, 1983, the FERC adopted a generic policy stance that producers who, before the adoption of Order No. 345, undertook a recompletion in a well that, prior to July 16, 1979, had been completed in the same tight formation, could not justifiably have undertaken their recompletion efforts in reliance on receiving the incentive price. Perlman cites to no facts, either before the FERC or on appeal, other than his asserted reliance on President Carter's energy speech and vague signals from the industry which would entitle him to special relief from the FERC's general policy of applying Order No. 345 in a prospective manner. We have already concluded that the FERC did not abuse its discretion in concluding that Perlman could not have reasonably relied on President Carter's energy speech in reentering the well. Thus, we also cannot say that the FERC abused its discretion in concluding that retroactive application of Order No. 345 was not warranted in the instant case where the only fact which Perlman cites to distinguish his case from other producers similarly situated is his asserted reliance on a Presidential speech and a newspaper article.

D. *Completion v. Production*

Finally, Perlman asserts that the FERC abused its discretion by failing to distinguish prior cases by the FERC where adjustment relief was granted to producers because of *de minimis* pre-NGPA production that otherwise would have disqualified the wells as "new" wells under NGPA § 102, 15 U.S.C. § 3312. Specifically, Perlman cites the cases of *Peterman-Sturlese Interests,* 17 FERC (CCH) ¶ 62,067 (1981) and *Holden Energy Corp.,* 19 FERC (CCH) ¶ 62,378 (1982), wherein the Director of the

FERC's Office of Pipeline and Producer Regulation granted adjustment from the definition of "production in commercial quantities" to prevent a minimum amount of production from a particular reservoir from disqualifying the production from that reservoir under § 102(c) of the NGPA.

 As noted by the FERC in a previous order, Perlman's reliance on the *Holden* and *Peterman* cases is misplaced. Unlike the *Holden* and *Peterman* cases, wherein the underlying concern was whether *production occurred* from the reservoir in question, the underlying concern in a resolution of a tight formation gas dispute is whether the well was *completed for production* prior to the critical date. In the instant case, the critical date is July 16, 1979. In accord with the purpose of the tight formation incentive pricing program to encourage producers to commit resources to the production of gas from a tight formation, the FERC has consistently adopted the position that so long as "all downhole facilities and operations" were completed before the critical date, a well is ineligible for the tight formations program even if no actual gas production occurred before that date. *Cline Oil and Gas Co.,* 17 FERC (CCH) ¶ 61,303 (1981).

> The rationale behind this requirement is that if all downhole facilities and operations have been completed in a well before July 16, 1979 (before the likelihood of an incentive pricing program for tight formation gas became apparent), there had already been a commitment of resources to the production of gas from the tight formation at the then-available prices....

*Cline,* 17 FERC at 61,600.

In the instant case, Perlman had already committed resources to the Cauthorn well prior to July 16, 1979. Thus, it was not the 1975 production from the Cauthorn well which prevented that well from qualifying for incentive pricing; rather, it was Perl-

man's completion of all downhole facilities in the Cauthorn well, signaling his commitment of resources to produce tight formation gas in the Canyon Sandstone Formation, which disqualified the Cauthorn well from the incentive pricing program. Even if no production from the Cauthorn well had occurred in 1975, Perlman's well would still not have qualified for the tight formation gas incentive pricing program. Thus, the FERC properly rejected Perlman's reliance on the *Holden* and *Peterman* cases, which addressed § 102 and "production in commercial quantities." Perlman's assertion that he is only seeking adjustment from the applicable regulations, and not to qualify for the incentive pricing program, does not alter our conclusion.[3]

## III. CONCLUSION

In sum, the FERC's order affirming the Director's decision to deny Perlman adjustment relief does not constitute an abuse of discretion in that the decision is supported by a rational basis, substantial evidence, and comports with prior FERC precedent. While Perlman's situation is unfortunate in that he undertook a business risk which resulted in financial loss, it is not the role of this Court to reevaluate the FERC's balancing of congressional policy as espoused in the NGPA and the particular equities presented by Perlman's situation. Thus, for the reasons stated, we affirm the FERC's order.

AFFIRMED.

---

**3.** Perlman also makes a general allegation that the FERC's decision is not supported by any evidence in the record. By making this contention, Perlman is essentially reurging his argument that the FERC erred in finding that he could not have reasonably relied on the pros-

pect of incentive prices in response to President Carter's speech when he reentered the Cauthorn well in September 1979. For the reasons stated previously regarding Perlman's reliance on President Carter's speech, this contention is without merit.